**BLUMENTHAL LAW OFFICES**

By: BRENT F. ROMNEY, SBN 72424

A Professional Law Corporation

Riverside Barrister Building

3993 Market Street

Riverside, California 92501

Telephone: (951) 682-5110


Attorneys for GEORGE JARAMILLO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. SA CR 07-36-AG |
| Plaintiff, | **DEFENDANT'S RESPONSE TO PRE-SENTENCE REPORT;** |
| v. | **DEFENDANT'S REQUEST REGARDING SENTENCING OF DEFENDANT.** |
| GEORGE JARAMILLO, | |
| Defendant. | DATE: 9-14-2009 |
| | TIME: 2:00 p.m. |


**TO: THE JUDGE OF THE ABOVE ENTITLED COURT, ASSISTANT UNITED STATES ATTORNEY BRET SAGEL, AND TO THE CLERK OF THE ABOVE ENTITLED COURT:**

Defendant George Jaramillo, through his counsel of record, Brent F. Romney, hereby submits his Response to the Pre-Sentence Report, as well as his Request re Sentencing. This Response and Request is based on the attached memorandum of points and authorities, the files and records in this case (specifically, the Plea Agreement), the files and records in the related case of

1    *United States v. Michael Carona*, SA CR 06-224-(D)–AG, the Pre-Sentence Report prepared by

2    the federal probation department, the United States Attorney's Response to the Pre-Sentence

3    Report, the United States Attorney's Motion for Downward Departure from the federal sentencing

4    guidelines, and such additional evidence or argument as may be presented at the sentencing

5    hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.
## INTRODUCTION

     On 1-4-1999, defendant was appointed to be an assistant sheriff by then newly elected Orange county Sheriff Michael Carona.

     On March 17, 2004 defendant was summarily fired by from his position as an assistant sheriff by then Sheriff Michael Carona. Within days, federal authorities contacted defendant, and defendant contacted federal authorities and began cooperating with them in their federal investigation into political corruption involving the Orange County Sheriff's department. Sheriff Carona became aware of defendant's cooperation with federal authorities.

### THREATS BY CARONA???

     On 9-29-2004, the Orange County District Attorney filed a criminal complaint alleging in 6 felony counts that defendant violated Pen. Code section 524(a) [misappropriation of public monies] and 4 misdemeanor counts that defendant violated Government Code section 87100 [conflict of interest]. The violations were alleged to occur between 8-30-2000 and 6-21-2002 while defendant was an assistant sheriff. Not coincidentally, Sheriff Carona was very involved in "assisting" the Orange County District Attorney in the investigation of this case. Defendant posted $25,000 cash bail and was allowed to remain out of custody. Defendant retained private counsel (Joseph Cavallo and two other attorneys) to represent him. On 7-25-2005, the District Attorney *dismissed all counts* filed against defendant. [See Orange Co. Superior Court case #04CF2899]

     On 7-25-2005, the same day that all charges alleged in OCSC case #04CF2899 were dismissed, the Orange County District Attorney arraigned defendant on an Indictment that accused defendant of five (5) *new and different felonies* and two (2) *new and different misdemeanor* crimes than those alleged in the previous criminal complaint. [See Orange Co. Superior Court case #05ZF0102] Defendant was charged in this Indictment with violating PC 182.1 [conspiracy to commit acts injurious to the public], four (4) felony counts of violating PC 68(a) [bribery], and two (2) misdemeanor counts of violating Government Code 87100 [conflict of interest]. Once again,

BLUMENTHAL
LAW OFFICES
3993 Market Street
Riverside, California

defendant had to post $25,000 cash bail.  Once again, he also had to retain counsel (Joseph Cavallo and one other attorney).  And once again, on 3-24-2006, the District Attorney *dismissed all counts* filed against defendant.[1]  [See Orange Co. Superior Court case #05ZF0102]

On 3-24-2006, the same day that the previous indictment was dismissed, the Orange County District Attorney arraigned defendant on a superseding Indictment that accused defendant of six (6) new and different felonies in addition to the five felonies and two misdemeanors alleged in the preceding indictment.  Defendant was now charged with 11 felonies and two (2) misdemeanors.  The new felony charges included two (2) counts of perjury and four (4) counts of misappropriation of public funds.  On this occasion, the court released defendant on his own recognizance.  Because his previous attorney, Joseph Cavallo, had himself been charged with criminal violations by the Orange County District Attorney[2], defendant had to retain new counsel (Robert Z. Corrado, Brent F. Romney and E. Thomas Dunn.).

On 1-29-2007, after fighting repeated unfounded allegations defendant was informed by the District Attorney of Orange County that if defendant did not enter a guilty plea within a few days, Defendant's wife would be arrested and booked.  Despite defendant's knowledge that his wife had committed no crime, defendant could not accept the probability of her having to endure the same public humiliation and vilification that he had endured for nearly three years.  Therefore, Defendant entered pleas of "*nolo contendre*" to one count of perjury (Pen. Code 118)[3] and one count of misappropriation of public funds (Pen. Code 424)[4].  Thereafter, the Orange County

---

[1] Although the Indictment was dismissed because a superseding indictment was filed, each of the felony and misdemeanor counts in this Indictment were also subsequently *dismissed* a second time by the District Attorney, since defendant eventually pled "no contest" to two counts that were not included in this Indictment.

[2] As the Court is aware, Sheriff Carona had also threatened to have attorney Joseph Cavallo prosecuted if he did not cease representing defendant in both the state prosecution of defendant and the federal investigation involving Carona.

[3] This count stemmed from testimony offered by Defendant in April of 2002 to an Orange County Grand Jury convened by the District Attorney to investigate potential wrong doing in the sheriff's department!  Defendant's 2002 testimony was subsequently read into the record by the District Attorney to the 2006 Grand Jury.

[4] This count was based on an 18 minute sheriff's helicopter ride defendant and his wife took from the hospital of his gravely ill mother to the airport in order to catch a flight to attend a White House function with the President of the United States.  Although defendant re-paid the county in 2002 for this expenditure, it was widely publicized.  It apparently was Sheriff Carona who brought this

District Attorney's Office dismissed all nine (9) remaining felony counts and both misdemeanor counts. Defendant was placed on three years formal probation and, among other terms and conditions, ordered to spend one year in jail.

In comments to the media the following day, District Attorney Tony Rackauckas referred to defendant's plea of "*nolo contendre*" as having been "leveraged", referencing the threatened prosecution of defendant's wife.[1]

On 1-29-2007, defendant entered pleas of "*nolo contendre*" to one count of perjury (Pen. Code 118) and one count of misappropriation of public funds (Pen. Code 424). Immediately prior to defendant's change of pleas, the prosecutors had threatened to file felony charges against defendant's wife, Lisa, if the case went forward any further.[2] The Orange County District Attorney dismissed all remaining felony and misdemeanor counts. Defendant was placed on three years formal probation and, among other terms and conditions, ordered to spend one year in jail.

On 3-13-2007, defendant pled guilty to a two count Information in the above entitled federal case; to wit:

- Count 1: Violation of 26 U.S.C. section 7206(1) [filing false tax return for year 1999].
- Count 2: Violation of 18 U.S.C. section 1341 and 1346 in year 2002 [mail fraud].

Defendant's pleas of guilty were the result of negotiations with the United States Attorney's Office in which the United States Attorney's Office and defendant agreed to certain conditions contained within the written plea agreement. Prior to this date, and since approximately March 2004, defendant had been cooperating with the federal investigation related to public corruption and

---

incident to the attention of the District Attorney's Office, even though there was ample additional evidence that the sheriff routinely used the sheriff's helicopter for his own personal activities.

[1] It has always been defendant's contention that the relentless barrage of baseless criminal allegations pursued by the Orange County District Attorney was part of an orchestrated effort involving collusion on the part of then-Sheriff Carona and District Attorney tony Rackauckas to destroy defendant and defendant's ability to challenge either man politically; to destroy defendant's credibility relative to any potential allegations of, or testimony regarding, criminal activities on the part of the sheriff or district attorney. The United States Attorney correctly alludes to the danger of this very occurrence in his Motion for Downward Departure before this court (Pg. 8 beginning at line 13).

[2] In a news conference the following day, District Attorney Tony Rackauckas admitted that they had "leveraged" the possible filing against defendant's wife to persuade defendant to resolve the state case.

related crimes that culminated in the Indictment of, among others, then Orange County Sheriff Michael Carona.

On about 3-24-2007, defendant began serving his one year jail sentence at the Montebello City Jail, a private jail for which defendant was required to pay. Defendant was released 8 month later.

It was between the time defendant entered his "no contest" pleas in the state case and his surrender to the Montebello City Jail that defendant entered his pleas of guilty in the above entitled case. Pursuant to the request of the United States Attorney's Office, defendant agreed to postpone his sentencing in the above entitled case until a future date. By doing so, defendant knowingly forfeited the possibility that the Superior Court might be willing to order his incarceration in that case to run concurrent with any incarceration ordered in the above entitled case. Indeed, the entry of his plea in the above entitled case was sealed and remained sealed until long after he finished his term of incarceration in the state case. Defendant agreed to keep his plea in the above entitled case confidential until after the United States Attorney's Office publicly announced it[1] in order to not impede the on-going federal investigation. In fact, on one earlier sentencing date, defendant was still in-custody at the Montebello City Jail and the United States Attorney's Office unilaterally continued the sentencing date to a future date. Although no objection was raised by defendant, nor does he object to it now, he raises the issue because this incident also demonstrated his willingness to assist the United States Attorney in their investigation, even though it prevented him again from potentially benefiting from any possibility of concurrent sentencing.

Defendant's sentencing in the above entitled case was eventually set for September 14, 2009. Pursuant thereto, the federal probation department prepared a Pre-Sentence Report and filed it with this Court on August 7, 2009. The federal probation officer also filed with the Court a letter in which she articulated her conclusions. The United States Attorney has filed a Response to the

---

[1] The day before the United States Attorney's Office publicly announced the Indictment of Sheriff Carona in case no. SA CR 06-224(D)-AG, previous counsel for defendant mistakenly thought it was ok to disclose to the media the fact that defendant had also entered pleas of guilty in the above entitled case and did, in fact, discuss defendant's plea agreement with the media. This arguably violated the agreement defendant had previously made with the United States Attorney's Office. Defendant, however, was personally unaware of this and never authorized his previous attorney to disclose information regarding his plea agreement because of his previous commitment to keep the agreement confidential until after the United States Attorney's Office made public the fact of his pleas.

BLUMENTHAL
LAW OFFICES
3993 Market Street
Riverside, California

Pre-Sentence Report, as well as a Motion for Downward Departure of 6 Levels in the federal sentencing guidelines.

## II.
## DEFENDANT'S RESPONSE TO THE PRE-SENTENCE REPORT

In the Pre-Sentence Report, the deputy probation officer concluded that defendant's total offense level was 17 and his criminal history category was II. (P-SR, 114.) The deputy probation officer calculated the sentencing range to be 27-33 months imprisonment. She then recommended that defendant serve a sentence of 27 months, pay a fine of $50,000, and be placed on formal probation for 3 years.

Defendant respectfully *disagrees* with the deputy probation officer's conclusion that the Base Offense Level for defendant's conduct is 17 for the following reasons:

## II.A.
## Discussion Involving Base Offense Level for Count One.

Count One of the Information alleges that on February 14, 2001 defendant belatedly filed his 1999 Federal Income Tax Return which he signed under penalty of perjury. Therein, he claimed on line 33 that his Adjusted Gross Income was $123,899, knowing that this amount was false and understated, in violation of 26 U.S.C. 7206(1) [filing a fraudulent or false statement]. However, Count One does *not* allege by what amount defendant underreported his income for year 1999. (See Information; Plea Agreement.)

Defendant pled guilty to that count.

**Plea Agreement Calculations for Count One**:

In the Plea Agreement, defendant and the United States Attorney's Office agreed and stipulated that the Base Offense Level for Count One was **10**. (Plea Agreement, p. 10, paragraph 11.) Both parties also reserved the right "to argue that additional specific offense characteristics, adjustments and departures are appropriate." (Plea Agreement, p. 10, paragraph 11.)

**The deputy probation officer's Base Offense Level Calculations for Count One**:

In the deputy probation officer's attempt to independently determine the Base Offense

BLUMENTHAL
LAW OFFICES
3993 Market Street
Riverside, California

Level for this violation alleged in Count One[1], she sought to determine how much taxable income was not reported by defendant for year 1999. She concluded that defendant underreported his taxable income that year by $30,711.43. (P-SR, p.8, paragraph 25.) She apparently reached this specific figure by reviewing the Factual Basis contained in paragraph 8, specifically the first 4 paragraphs on page 5 of the Plea Agreement. Therein, she simply added $7,000 defendant received from D.H. in 1999 to $23,711.43 which was the amount defendant owed on his outstanding lease on a Mercedes Benz at the time D.H. took the car and paid off the outstanding lease for him. (Plea Agreement, p. 5) Earlier in the P-SR, however, the deputy probation officer acknowledged that the financial benefit to defendant for this transaction was only $11,711.43. (P-SR, p. 6, paragraph 15.) Why she subsequently contradicts herself at P-SR, page 8, paragraph 25 is unknown, but is probably just an innocent error.

Multiplying the erroneous $30,711.43 (rather than her previously determined $18,711.43) amount by 28%, she concluded the unpaid taxes for that year amounted to approximately $8,600. According to USSG 2T4(1)(c), this amount was greater than $5,000 but less than $10,500, thereby indicating the Base Offense Level for Count One is **10**. (See P-SR, pp. 10-11, paragraphs 39-40.)

Further, the deputy probation officer concluded that a) because the unreported income of $30,711.43 was greater than $10,000, and b) because it was obtained "from criminal activity", an additional **2** level increase is warranted. She reached the conclusion that the $30,711.43 was "from criminal activity" because it was "derived from honest services fraud." (See P-SR, pp. 11, paragraph 41.)

According to the deputy probation officer's calculation, therefore, the Base Offense Level for Count One is **12**.

**Defendant's Base Offense Level Calculations for Count One:**

Pursuant to the plea agreement, defendant stipulated to the following facts as they may pertain to Count One:

- Defendant stipulated that he "did not believe that this 1999 U.S. Individual Income Tax Return to be true and correct as to every material matter in that said return falsely reported $123,899 on Line 33, Adjusted Gross Income, whereas, as defendant Jaramillo then and there well knew and believed, said amount was false and understated.

---

[1] Neither the Court nor the Probation Department is bound by the agreement made between the defendant and the United States Attorney's Office. (Plea Agreement, p. 10, paragraph 13.

- Defendant stipulated that he received $7,000 from D.H. that he did not report in his Form 1040 filing in 1999 this income. (Plea Agreement, p. 5, paragraph 8.)
- Defendant stipulated that he had a lease on a 1997 Mercedes Benz with a balance of $23,711.43. D.H. took the car, paid off the defendant's balance on the lease, then sold the car for approximately $12,000. Hence, D.H. made a gift to defendant of approximately $11,711.43. (Had defendant paid off the lease himself, then sold the car himself, he would have "lost" the difference, or approximately $11,711.43.)

Initially, there is no indication that defendant was ever told what happened to his leased Mercedes Benz, or for what amount it had been sold. In fact, defendant did not become aware of these facts until the United States Attorney's Office advised him of them during the negotiation of the plea agreement. If he was not aware of any alleged "income" he received, he could hardly be accused of knowingly filing a false Form 1040 in 1999.

If he was not aware of any alleged "income" he received from this transaction, he can hardly be accused of knowingly filing a false Form 1040 in 1999.

However, even if defendant had been told what happened to his vehicle, this incident involving the Mercedes Benz lease was not "income" to defendant that he had to report on his Form 1040. It was a "gift" to him by D.H., and the tax liability for a gift is on the "giver" (absent certain exceptions not applicable here). Hence, regardless of whether the value of the "gift" was $11,711.43 as the deputy probation officer initially determined, or whether it was $23,711.43 as she subsequently and mistakenly concluded, defendant had no obligation to include it on his Form 1040 as income.

Therefore, the *only* income that defendant failed to report on his Form 1040 in 1999, and for which he entered his plea of guilty to Count One, was the $7,000 given to him for his "service" on the Board of Directors of Charity Funding Services. Multiplying $7,000 by 28% produces a tax liability of about $1,960. According to USSG 2T4(1)(c), this amount was "$2,000 or less", making it a Base Offense Level of **6**.

Additionally, there was nothing unlawful or illegal about defendant's receipt of the $7,000. It was not stolen or embezzled property, nor was the money the proceeds of criminal activity such as drug sales, etc. The receipt of the $7,000 was not unlawful, nor was the source of the money an unlawful source. It was his subsequent *failure to report* the $7,000 on his 700 Disclosure Form and his IRS 1040 Form that was unlawful. Hence, since the "source of the income" was *not* from criminal activity, the assignment by the deputy probation officer of 2 additional Base Offense Level points is not warranted nor justified. (See P-SR, pp. 11, paragraph 41.)

According to defendant's calculation, therefore, the Base Offense Level for Count One is **6**.

However, defendant acknowledges that he stipulated with the United States Attorney that for purposes of sentencing, the Base Level Offense is **10**. It is *not* 12, defendant respectfully asserts, as the deputy probation officer claims.

### II.B.
### Discussion Involving Base Offense Level for Count Two

Count Two of the Information alleges that defendant was a) an assistant sheriff for the County of Orange, and b) a member of the State Advisory Group on Juvenile Justice Delinquency Prevention (hereafter, SAG-JJDP), and that in those capacities, defendant was required to file pursuant to Government Code sections 87200 and 87203 a Form 700 Statement of Economic Interests (hereafter Form 700) for each year. Between June 1, 1998 and March 17, 2004, defendant filed a Form 700 for each year, but failed to disclose certain gifts and loans he received from individuals during these periods of time on these forms. The federal court has jurisdiction over this offense for year 2002 because on March 7, 2003, defendant utilized the United States mail to send one of these Form 700's to Sacramento.

**Plea Agreement Calculations for Count Two**:

In the Plea Agreement, defendant and the United States Attorney's Office agreed and stipulated that the Base Offense Level for Count Two was **10**. Additionally, both parties stipulated that because defendant accepted responsibility at an early date, the Base Offense Level would be reduced by 2. Hence, the stipulated Base Offense Level for County 2 was **8**. (Plea Agreement, p. 10, paragraph 11.) Both parties also reserved the right "to argue that additional specific offense characteristics, adjustments and departures are appropriate." The United States Attorney also agreed to recommend an additional one-level reduction, if appropriate. (Plea Agreement, p. 10, paragraph 11.)

**The deputy probation officer's Base Offense Level Calculations for Count Two**:

The deputy probation officer concluded that because defendant was an assistant sheriff and because he was a member of the State Advisory Group on Juvenile Justice Delinquency Prevention (hereafter, SAG-JJDP), he was required pursuant to Government Code 87200 and 87203 to file annually a California Fair Political Practices Commission Form 700 Statement of Economic Interests (hereafter, Form 700). (P-SR, pp. 6-7, paragraphs 17-21.) She then discusses what

income and gifts she believes that defendant failed to report on his Form 700's from 1999 to 2004. (P-SR, pp. 7-8, paragraphs 22-25.)

The deputy probation officer thereafter explained how she reached her opinion regarding what the Base Offense Level is for Count 2. Even though Count Two refers to the year 2002, for which defendant mailed his Form 700 to Sacramento in March of 2003, she renders her opinion that all gifts and loans which defendant received while a public official are relevant to her calculations. (P-SR, p. 10, paragraph 37.)

She explains that a violation of 18 U.S.C. 1341 and 1346 is not included in Appendix A of the USSG. Hence, to determine the appropriate Base Level Offense, the Application Note 1 for USSG section 1B1.2 states:

> ...for statutory provisions not listed in the Statutory Index, the most analogous guideline, determined pursuant to section 2X5.1 (Other Offenses) is to be used.

The deputy probation officer concludes that the "most analogous guideline" is USSG section 2C1.1 (Offering, Giving, Soliciting, or Receiving a Bribe; Extortion under Color of Official Right.) The Base Offense Level for this offense is **10**. (P-SR, pp. 11-12, paragraphs 46-48.)

She then refers to a subsection of USSG 2C1.1 and states "if the offense involved more than one bribe or extortion, there is a two level increase." (P-SR, p. 12, paragraph 49.) She then adds two levels, bringing the Base Offense Level for Count Two to **12.**

Continuing, she cites USSG 2C1.1(b)(2)(B) that "if the offense involved a payment for the purpose of influencing an elected official or any public official in a high-level decision-making or sensitive position, an eight level increase is applied." She cites the USSG Application Note that an assistant sheriff qualifies under this section. What she conspicuously *omits* is what evidence proves that any of the "gifts or loans" made to defendant that he failed to report on his 700 Forms was done "for the purpose of influencing him." In any event, she adds an additional 8 levels and concludes that the Base Offense Level for Count Two is **20**. (P-SR, p. 12, paragraph 51-55.)

**Defendant's Base Offense Level Calculations for Count Two:**

Defendant respectfully asserts that the deputy probation officer's analysis involves several material errors.

Initially, it should initially be noted that defendant was *not* required, pursuant to Government Code sections 87200 and 87203 to file Form 700's every 12 months. Section 87200 states:

Applicability of article. This article is applicable to elected state officers, judges and commissioners of courts of the judicial branch of government, members of the Public Utilities Commission, members of the State Energy Resources Conservation and Development Commission, members of the Fair Political Practices Commission, members of the California Coastal Commission, members of planning commissions, members of the board of supervisors, district attorneys, county counsels, county treasurers, and chief administrative officers of counties, mayors, city managers, city attorneys, city treasurers, chief administrative officers and members of city councils of cities, and other public officials who manage public investments, and to candidates for any of these offices at any election. (Cal. Gov. Code 87200)

Section 87203 states:

Every person who holds an office specified in Section 87200 shall, each year at a time specified by commission regulations, file a statement disclosing his investments, his interests in real property and his income during the period since the previous statement filed under this section or Section 87202. The statement shall include any investments and interest in real property held at any time during the period covered by the statement, whether or not they are still held at the time of filing. (Cal. Gov. Code 87203.)

Nowhere in either of these Government Code sections does it state the County's elected sheriff or a city's appointed chief of police must file Form 700's. If the sheriff or chief of police is not required by those sections to file Form 700's, certainly lesser ranking deputies and officers would not be required to file Form 700's pursuant to those Government Code sections. Hence, as charged in the wording of the complaint and alleged in the Plea Agreement, defendant was *not* required to file Form 700's pursuant to Government Code sections 87200 and 87203. It is not clear to defendant why the deputy probation officer claims in paragraphs 18 and 20 that defendant had a legal duty to file Form 700s pursuant to Government Code sections 87200 and 87203.

However, defendant acknowledges that in the Plea Agreement, he stipulated that the Statement of Facts is sufficient to support his guilty plea as to Count Two, and defendant is not attempting to renege on the agreement he entered into with the United States Attorney.

A much more serious error made by the deputy probation officer, however, involves her selection of USSG section 2C1.1 (Offering, Giving, Soliciting, or Receiving a Bribe; Extortion under Color of Official Right.) as "the most analogous guideline" for determining the Base Offense Level for Count Two. (P-SR, pp. 11-12, paragraphs 46-48.) She quotes USSG section 2C1.1, but she *fails to even mention for the Court's consideration the very next guideline that is even more analogous* to the Plea Agreement's Statement of Facts. USSG section 2C1.2 refers to "Offering,

Giving, Soliciting or Receiving a Gratuity."

*There is simply no evidence that defendant was in any way involved in soliciting or receiving bribes or extorting anyone under color of authority!* If there had been evidence, defendant would have been prosecuted for that. He was charged by the Orange County District Attorney with similar allegations, but each of the bribery charges was subsequently *dismissed* by the District Attorney. This Court is well aware of the evidence presented in the related case of *United States versus Michael Carona.* No charges of bribery were alleged in that case, and no evidence of bribery was presented in that case. Similarly, *no allegations* that defendant was involved in bribery activity was made by the United States Attorney. Why the deputy probation officer, apparently on her own initiative, decided that this case involves bribery and, therefore, selected USSG guidelines that prescribe punishment for bribery is unknown. She apparently did *not* speak with the United States Attorneys assigned to this case because they would be the first to know if defendant had been involved in bribery activity. They would also be the first to advise the deputy probation officer that there is no evidence defendant was involved in any type of bribery activity. Defendant respectfully asserts that her repeated references to bribery activity involving defendant is grossly unfair to defendant and potentially very misleading to the Court. Defendant respectfully requests this Court disregard any comments regarding bribery or any analysis of the USSG that involve bribery activity.

There was evidence, however, and defendant stipulated to the Statement of Facts in the Plea Agreement, that he received certain gifts and loans while he was a public official that he did not disclose on his Form 700. If anything, these gifts and loans were "gratuities" that were unrelated to any attempt to bribe defendant. For example, many of the gifts received by defendant, but not reported on Form 700, were Christmas, anniversary, or birthday gifts given to him by friends! Often, these gifts were exchanged during joint family celebrations on these special occasions.

In her paragraph 49 of the P-SR, she adds two points pursuant to USSG 2C1.1(b)1 because in her opinion, defendant was involved in more than one incident of bribery or extortion. Again, there is no evidence of even a single incident involving bribery or extortion. Defendant respectfully asks the Court to disregard this recommendation.

Finally, in paragraph 51 of the P-SR, the deputy probation officer recommends adding 8 additional points pursuant to USSG 2C1.1(b)(2)(B); that the defendant received "a payment for the purpose of influencing . . . a public official in a high level decision making . . . position." There is simply *no evidence* that any gift or loan to defendant that he did not include on his Form 700's was ever given to him "for the purpose of influencing" him in a decision that he was to make as a public official. Defendant respectfully requests the Court reject this recommendation also.

It should be considered very significant that the United States Attorney, when negotiating with the defendant, did not include any allegation of bribery in their analysis. Further, their stipulation to a Base Offense Level of 10 undermines the deputy probation officer's opinions. Certainly, the United States Attorney is in a better position to know whether defendant was involved in any form of bribery. Their conduct in this case underscores defendant's position that there was none, and the deputy probation officer's conclusion that there was is simply not supported by any evidence.

Accordingly, Defendant submits the following analysis of the U.S.S.G. for determining the appropriate Base Level Offense for Count Two, assuming as part of the Plea Agreement stipulation that defendant had a legal duty to file Form 700s each year:

A more analogous guideline in this case for determining what the Base Offense Level should be is U.S.S.G. 2C1.2 [Offering, Giving Soliciting or Receiving a Gratuity] (See *United States v. Mariano* (1st Cir. 1993) 983 F.2d 1150 [2C1.1 bribery guideline applies when transfer of money has corrupt purpose, whereas gratuity provision of 2C1.2 does not include corrupt purpose.].) The Base Offense Level for this guideline is **7**. However, even this guideline is not analogous to the facts of this case because, as the Background comment to this guideline states, the gratuity must be given to the public official "in respect to an official act." That is, a "thank you" gift given after a decision was made, etc. In this case, there is no evidence in Year 2002, or any other year that defendant filed Form 700's, that any gift or loan given to him was "in respect to an official act." The "Specific Offense Characteristics" levels pertaining to this guideline do not apply since there is no evidence that any of the gratuities were given "in respect to an official act."

## II.C.
## CONCLUSION

The defendant has included the above analysis as to Count One and Count Two simply to illustrate that the deputy probation officer's calculations are in error. The Base Offense Level for Count One should be deemed **6**. The Base Offense Level for Count Two should be **7** and there should be no Specific Offense Characteristics levels added to either Count. However, defendant acknowledges that he stipulated with the United States Attorney in the Plea Agreement that the Base Offense Level for Count One is 10 and the Base Offense Level for Count Two is also 10. It is not the intent of defendant to renege on that which he previously agreed to, but rather, to persuade the Court to accept the Base Offense Levels stipulated to by the defendant and the United States Attorney. Accordingly, the following analysis is requested by defendant:

| Base Offense Level for Count Two: | 10 |
| Acceptance of Responsibility | -3 |
| Substantial Assistance | -6 |

Total Offense Level:    **1**

In his Response to the P-SR, the United States Attorney simply adopts the deputy probation officer's position that the Base Offense Level is 10 and the Specific Characteristics Level is 10, making the Total Offense Level 20 for Count Two. They thereafter recommend that 3 point levels be removed for Acceptance of Responsibility and 6 point levels for Substantial Assistance. The resulting Total Offense level would be **11**. (See USA's Brief in Response to P-SR, p. 6.

But, by adopting the rationale of the probation department, the United States Attorney now urges the Court to do what it has consistently *declined* to do: It asks the Court to increase defendant's Offense Level because he was supposedly involved in activities involving bribery. If the United States Attorney were of that belief and there was evidence to support it, they should have charged defendant with bribery. They did not because there is no evidence defendant was involved in bribery in any form.

Additionally, the Criminal History Category of defendant, as recommended by the Deputy Probation Officer and subscribed to by the United States Attorney's Office is II,   However Defendant respectfully asks the court to apply a Category I standard in determining Defendant's sentence.   In Defendant's plea agreement it states "There is no agreement as to defendant's criminal history or criminal history category" (Pg. 10 lines 19-20)  The prosecutions of defendant leading to his ultimately entering a plea of "nolo contendre" were brought about by the actions of then-Sheriff Carona in collusion with the District Attorney.  The Defendant was arguably being unduly persecuted, not fairly prosecuted,  The overall intent of the state prosecutions, vigorously assisted by Sheriff Carona, was to paint him as a criminal and to destroy his credibility, all in an effort to protect the Sheriff from anything defendant could say about the Sheriff's illegal conduct. The United States Attorney, himself, recognizes this as a legitimate probability in his Motion for Downward Departure before this Court.   To utilize the state prosecution and plea of "*nolo contendre*" to increase the potential penalty to defendant in this federal case simply exacerbates the unfairness of the state prosecution, and results, defendant respectfully asserts, in further injustice to defendant.   However, regardless of whether the Court deems defendant's Criminal History Category as I or II, under defendant's analysis he falls within Zone A for purposes of sentencing

pursuant to the U.S.S.G.

Defendant respectfully requests this Court conclude that the Total Offense Level is 1, the Criminal History Category of defendant is I, and he therefore falls within Zone A for purposes of sentencing pursuant to the U.S.S.G.

### III.A.

### Discussion Involving the Basis for Incarcerating Defendant for 27 Months

If the Court concludes that defendant falls within Zone A, he may appropriately be placed on probation without any custody time as a term and condition of probation. This is what defendant asserts is the appropriate sentence. In effect, when all is said and done, in Count One defendant failed to report $7,000 on his IRS Form 1040. In Count Two, he failed to disclose various gifts and loans given to him while an assistant sheriff in 2002, none of which were even remotely related to bribery, extortion, or any official act. Since none of his decisions as a public official were requested by individuals who gave him gifts or loans, and none of his decisions as a public official had any positive impact on any of the individuals who gave him the undisclosed gifts or loans, his failure to report these gifts or loans would arguably not even be deemed "material" non-disclosures. Defendant simply failed to disclose certain gifts and loans that would have made no difference whatsoever to his decision making had he disclosed them.

If, however, the Court believes a period of incarceration is necessary, defendant urges the Court to follow the United States Attorney's recommendation of home confinement. It is, after all, the United States Attorney's Office who is in the best position to evaluate the assistance provided to them by defendant. Public policy suggests the Court give deference to their recommendations in this regard.

### III.B.

### Discussion Involving the Recommendation to Impose a $50,000 Fine.

The deputy probation officer recommends to the Court that a fine of $50,000 be imposed on defendant in addition to his serving 27 months in federal prison. She bases this on her assertion that a large fine will "hopefully force defendant to re-evaluate his lifestyle and spending habits." (Letter to Judge Guilford, p. 4, paragraph 3.) This is, defendant respectfully asserts, a remarkable comment to make and borders on urging the Court to involve itself in "social engineering." Apparently, the deputy probation officer thinks defendant and his wife should be ordered by this Court to spend their money in ways that the deputy probation officer thinks is more appropriate. In response, defendant asks the Court to consider the following:

- Defendant and his wife purchased their home in Dove Canyon more than 15 years ago when defendant was earning a sergeant's pay at the Garden Grove Police Department. This purchase reflects years of sacrifice and saving money in order to make this purchase. No one helped them in their down payment. Contrary to the deputy probation officer's negative assertion, their ability to purchase an attractive home in a nice neighborhood reflects very positively on their "lifestyle and spending habits."

- When defendant's world "turned upside down" beginning in late 2003 and early 2004, there was sufficient equity in their home that he was able to take out a second trust deed on their home and use much of the equity. The money they received in this financial transaction was used by defendant to support his wife, their two children, his elderly mother and his two elderly aunts. Only when defendant was able to obtain a different job in a field other than the two he was previously trained to do (law enforcement and law) was he able to earn added income to support his family. These funds also went to pay for the extensive legal fees that he necessarily incurred in successfully defending himself against three separate prosecutions by the Orange County District Attorney, as well as his legal representation in the instant case. The mere fact that he and his wife continue to make their hefty monthly mortgage payments suggests *excellent* financial judgment on their part because they still own and live in their home! No lender has had to foreclose on their home because of their inability to make their payments despite the significant and unexpected expenses they have incurred. In fact Defendant and his wife have not filed for bankruptcy protection, are current with all creditors, and have asked for no outside assistance. That is more than can be said for so many other people whose homes have gone into foreclosure or who have availed themselves of the federal bankruptcy laws. Contrary to the deputy probation officer's negative assertion, their large mortgage payment, and their ability to make those payments, is a very positive reflection of their "lifestyle and spending habits."

- The home in which the Jaramillo's live has a homeowner's association fee that goes to upkeep in that community, as well as provide recreational activities for those who live there. Neither defendant nor his wife golf, but they are required to pay for golfing privileges because they live in that community. In fact, most people would love to live in that community and raise their children there, but they cannot afford to live in that community. Again, contrary to the negative assertion of the deputy probation officer, their home and the costs of home ownership are a reflection of excellent "lifestyle" and excellent "spending habits."

- Defendant and his wife are successfully raising two children. They provided 100% support

for their son when he served a two year mission for his church. They provide their son a car to use while attending college. They are financially assisting their son as he attends college. They would not be able to do these things if their lifestyle and spending habits were overly extravagant and needed changing.

- Defendant and his wife provide almost 100% financial support for three very elderly women. One is bedridden because of a stroke. One is battling cancer. The third shows early signs of dementia. Yet defendant and his wife have provided financial support for these women for years, and they will continue to do so as long as it is necessary. Having "premium cable television" in that home is not a luxury. It is a necessity for these three women who are all homebound. Somehow, the deputy probation officer's comment that a stiff fine "will hopefully force defendant to re-evaluate his lifestyle and spending habits" rings very hollow. Taking care of aging and increasingly dependent elderly family members certainly "flies in the face" of the deputy probation officer's claim that the Jaramillo's are selfishly engaged in a lifestyle that is well beyond their means! One only wonders if she, or the United States Attorney who urges the Court to impose a fine and "restitution" of more than $200,000, would be financially able to accomplish even a portion of what the Jaramillo's have accomplished.

- Defendant and his wife pay tithes and offerings to their church and other charitable organizations in an amount of significantly more than 10% of their pre-tax income each year. Perhaps the deputy probation officer thinks this money could be better spent!

- Defendant and his wife do not drink alcohol or smoke. Their entertainment bills do not include those expensive luxuries. Perhaps if defendant and his wife remained home and drank excessive amounts of beer and chain smoked cigarettes, rather than go on dates with each other and dine at nice restaurants, this would, in the deputy probation officer's mind, be money better spent. Perhaps because the Jaramillo's do invest more time and money on family activities than most other couples, rather than on alcohol, tobacco, golf and other expensive habits their marriage is strong, their family is close, and they are surrounded by any good and caring friends.

- For the court's knowledge, when defendant began cooperating with the federal investigation in this case, he became aware that he may have tax liabilities. Pursuant to his agreement with the United States Attorney, he has already begun the process of paying any back taxes owed to the government in the years other than just 1999. He is making monthly payments to the IRS, and he intends to pay off any and all back taxes with any funds he receives from the civil judgment he recently obtained against the County of Orange.

BLUMENTHAL
LAW OFFICES
3993 Market Street
Riverside, California

However, in order to assure the IRS that he intends to pay his back taxes (once the amount is determined), he agreed to let them place a lien on his home. The government had no legal right to encumber his property, but defendant allowed them to do so as an offer of good faith.[1]

As the Court can surmise from the above comments, the author of this brief was somewhat "taken aback", if not outright offended, by the cavalier comments of the deputy probation officer in her attempts to justify why the Court should impose such a large fine. She urges this Court to incarcerate defendant for 2½ years even though he is the primary financial support for 7 people. Then, as soon as he exits prison, she further urges the court to take several hundred dollars from defendant's pocket each month to pay large court fines. She apparently failed to consider the fact that defendant will lose his present job if incarcerated, and that it may take time, if ever, to secure a comparable job. She also apparently does not reflect on the impact her recommendations will have upon defendant's family members. The Court, however, does have the discretion to consider these factors in evaluating if a fine should be ordered, and if so, the amount.

### III.C.
### Discussion Involving the Recommendation to Order Restitution of $183,688.66.

Remarkably, and for *the very first time* in the lengthy 5½ year investigation and prosecution of defendant and others in related cases, the Assistant United States Attorney urges this Court to order defendant to pay almost $200,000 in restitution!

To suggest this argument is both unfair and underhanded at this late date is a *gross* understatement. It is absolutely shameful that the United States Attorney employs this tactic at this time. Why did the United States Attorney decide to *not* be upfront and honest with defendant and his counsel from the very beginning? Why did the United States Attorney not insist that this be part of the Plea Agreement? Why did the United States Attorney wait until just days before sentencing to "sandbag" defendant with this rather incredible recommendation? And this in addition to a $50,000 fine that he also urges. They apparently withheld this information from defendant and his legal counsel for over 5½ years because they knew defendant might not assist them if they were to be honest and disclose this to him. When the United States Attorney's Office

---

[1] As the Court is undoubtedly aware, any proceeds defendant receives from the civil judgment are split with his legal counsel on a basis agreed upon in the contingent fee agreement. The IRS gets the remainder until taxes are paid. The Court is hereby urged to not determine how defendant is to use these funds, if and when he receives them.

BLUMENTHAL
LAW OFFICES
3993 Market Street
Riverside, California

needed defendant's help, they received it.  Defendant made numerous proffered statements and willingly assisted the government at every step of the way in their investigation and prosecution of then Sheriff Carona.  He agreed to plead guilty to two counts, agreed to remain silent about his agreement so it would not jeopardize the government's investigation of Sheriff Carona, and agreed to postpone his sentencing until after the Carona prosecution, thereby forfeiting any possibility of having potential prison time run concurrent with his state conviction.  When they needed his help, why did they not tell him that they would be insisting that he pay over $230,000 in fines and restitution, *in addition* to any imprisonment that they may recommend to the Court?  It seems that this act could be seen as a breach of the plea agreement on the part of the Government.  It is certainly disingenuous on the part of the government.  Society's expectation that our government plays fair and abides by the rules is of paramount importance.

Out of a sense of justice and fairness, defendant respectfully requests the Court reject the government's request that defendant be ordered to pay over $180,000 in restitution.  However, in addition to the *gross unfairness* that the government seeks to perpetrate on defendant at this time, the government has other problems that legally undermine their request for restitution.

The legislative history of the VWPA illustrates the increased desire by Congress to address "victims" of crime, and to "help restore victims to [their] prior state of well being."  The legislative history also suggests that the prototypical victim is a "private individual":

> The VWPA was first enacted in 1982 in an effort to afford greater protection to victims and witnesses, and to enhance their stature in the criminal justice system. [Citation]  The object of the restitution provisions in particular was to help "restore the victim to his or her prior state of well-being." [Citation]  Although the word "victim" was not precisely defined in either the original Act or its accompanying commentary, it is pellucid that, in the eyes of the enacting Congress, the prototypical victim was a private individual. (*United States v. Gibbens*, (1st Cir. 1994) 25 F.3d 28, 34.)

The "victim" of a criminal offense is defined as one who is "directly harmed by the defendant's criminal conduct."

> To be sure, Congress amended the VWPA in 1990, adding a statutory definition of "victim" as one "directly harmed by the defendant's criminal conduct." (*United States v. Gibbens*, (1st Cir. 1994) 25 F.3d 28, 34.)

BLUMENTHAL
LAW OFFICES
3993 Market Street
Riverside, California

Federal courts, however, have consistently held that "governmental entities" can be "victims" under the VWPA. (*United States v. Martin* (7th Cir. 1997) 128 F.3d 1188, 1190-1191.) However, as with victims who are individuals, a governmental entity can be deemed a "victim" only if that entity is one that was "directly harmed by the defendant's criminal conduct." (*United States v. Gibbens* (1st Cir. 1994) 25 F.3d 28, 34.)

Further, regardless of whether the victim is an individual or a government entity, Congress never intended that the "restitution calculus" for determining restitution should extend "beyond those [losses] caused by the offense of conviction." The Supreme Court addressed this issue in 1990:

> . . . section 3580(a)'s catchall phrase does not reflect a congressional intent to include in the restitution calculus losses beyond those caused by the offense of conviction. Section 3580(a) sets forth the considerations for "determining whether to order restitution under section 3579 of this title and the amount of such restitution." The first such consideration is "the amount of loss sustained by any victim as a result of the offense." This language suggests persuasively that Congress intended restitution to be tied to the loss caused by the offense of conviction. . . . the catchall phrase should not be read to introduce into the restitution calculus losses that would expand a defendant's liability beyond the offense of conviction. (*Hughey v. United States* (1990) 495 U.S. 411, 419.)

The Supreme Court in *Hughey* concluded that

> . . . the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order..(*Hughey v. United States* (1990) 495 U.S. 411, 420.)

In arguing that restitution orders should encompass more of a defendant's conduct than the offenses for which he is found guilty, the People in *Hughey* argued that oftentimes not all charges are filed, or that in the process of plea bargaining, some charges (and victims) are dismissed. Hence, restitution orders should encompass more than just the charges for which the defendant is convicted. The Supreme Court rejected this argument:

> The Government endeavors to buttress its interpretation of the statute by invoking the expansive declaration of purpose accompanying VWPA [ (one purpose of the Act is "to ensure that the Federal Government does all that is possible within limits of available resources to assist victims . . . without infringing on the constitutional rights of the defendant"), and by referring to portions of the legislative history that reflect Congress' goal of ensuring "that Federal crime victims receive the fullest possible

restitution from criminal wrongdoers,". . .  The Government also emphasizes policy considerations that purportedly support court-ordered restitution for acts outside the offense of conviction. Without such authority, the Government insists, in many cases courts cannot compensate victims for the full losses they suffered as a result of a defendant's conduct. The potential for undercompensation is heightened by prosecutorial discretion in charging a defendant, the argument goes, because prosecutors often frame their indictments with a view to success at trial rather than to a victim's interest in full compensation. [citation]. Finally, the Government maintains that the extensive practice of plea bargaining would, as a practical matter, wholly undermine victims' ability to recover fully for their losses because prosecutors often drop charges of which a defendant may be guilty in exchange for a plea to one or more of the other charges. [Citation].

These concerns are not insignificant ones, but neither are they unique to the issue of victim compensation. If a prosecutor chooses to charge fewer than the maximum possible number of crimes, the potential recovery of victims of crime is undoubtedly limited, but so too is the potential sentence that may be imposed on a defendant. And although a plea agreement does operate to limit the acts for which a court may order the defendant to pay restitution, it also ensures that restitution will be ordered as to the count or counts to which the defendant pleads guilty pursuant to the agreement. The essence of a plea agreement is that both the prosecution and the defense make concessions to avoid potential losses. Nothing in the statute suggests that Congress intended to exempt victims of crime from the effects of such a bargaining process. (*Hughey v. United States* (1990) 495 U.S. 411, 422.)

In the instant case, however, the United States Attorney attempts to expand the definition of "victim" as defined by the federal courts.  He urges this Court to accept the concept that a governmental entity includes "the citizens of the County of Orange and of the State of California. (Response to P-SR, p. 9.) What the United States Attorney does *not* do is explain how the "citizens" of a county or state are a "governmental entity" within the county's or state's government.  Nor does the United States Attorney cite any authority or case law that a "governmental entity" includes the citizens who reside within the respective county or state.  Each of the cases he does cite has, as a victim, a "governmental entity", such as the Postal Service, Medicare, Small Business Administration, the Department of Labor, Aid to Families with Dependent Children (AFDC), etc. (*United States v. Martin* (7th Cir. 1997) 128 F.3d 1188, 1190-1191),

Furthermore, in each of the published cases in which a governmental entity is deemed to be the "victim" for restitution purposes, the governmental entity itself was "directly harmed by the

1    defendant's criminal conduct."

2        To support his argument in the instant case, the United States Attorney makes much of the
3    phrase "honest services fraud", and suggests that the gifts, loans or moneys defendant received while
4    serving as assistant sheriff were in some manner "honest services fraud." *Not so.* The *only*
5    wrongdoing on defendant's part was his *failure to report* the gifts, loans or moneys received on his
6    Form 700 Disclosure Statement. Had he done so, there would have been no criminal conduct even
7    though he received gifts, loans and moneys while serving as a public official. Why? Because none
8    of the gifts, loans or moneys were from an illegal source, none were proceeds from illegal
9    contraband, none were the product of bribery or extortion under color of authority, etc. The United
10   States Attorney, as well as the deputy probation officer, try to make defendant's receipt of gifts,
11   loans and moneys illegal conduct. *It was not.* The only "illegal conduct" was his failure to report
12   some of the gifts, loans and moneys he lawfully received on his form 700 Disclosure Statement.
13
14

15       Therefore, which governmental entity was "directly harmed by the defendant's criminal
16   conduct"? None. Defendant did not embezzle money from the Small Business Administration; he
17   did not conspire to defraud AFDC with an illegal scheme to misuse food stamps. None of the gifts,
18   loans or moneys he received was the result of his bribing or extorting gifts, loans or moneys from the
19   citizens of Orange County. The gifts, loans and moneys he received were not the property of the
20   citizens of Orange County. To order restitution to the "citizens of Orange County" would be an act
21   of unjust enrichment to the citizens of Orange County.
22

23       Finally, in the United States Attorney's zeal to persuade the Court to order almost $200,000
24   in restitution to the citizens of the County of Orange (or to the citizens of the State of California?),
25   he argues that defendant's "scheme to defraud the citizens of Orange County included getting
26   Carona elected using illegal campaign contributions and [defendant] and Carona running the OCSD
27   to benefit and enrich themselves." (Response to P-SR, p. 11.) However, defendant did not plead
28   guilty to a "scheme to defraud the citizens of Orange County." He did not plead guilty to "running
29   the OCSD to benefit and enrich himself." As the Supreme Court explained in *Hughey, supra,*
30   restitution should not extend "beyond those [losses] caused by the offense of conviction", and . . .
31

32       . . . the loss caused by the conduct underlying the offense of conviction establishes the
33       outer limits of a restitution order..(*Hughey v. United States* (1990) 495 U.S. 411,
34       420.)
35

36   In the instant case, Count One alleges that defendant failed to report $7,000 on his IRS Form

1040 in 1999. The $7,000 is proper restitution that defendant should be ordered to pay to the IRS. No other governmental entity, and certainly no citizen of Orange County was "directly harmed by the defendant's criminal conduct." In Count Two, defendant failed to disclose certain gifts, loans and moneys he lawfully received in 2002 while he was an Assistant Sheriff. There is no governmental entity, and certainly no citizen of Orange County, who was "directly harmed by the defendant's criminal conduct."

It seems as though both the prosecutor and the deputy probation officer want to squeeze out whatever hope defendant and his family have of ever being able to put their lives back together.

Finally, the irony inherent in the United States Attorney's argument is humorous, to say the least. After an extended, lengthy bench trial, Superior Court Judge Andrew Banks ruled that the County of Orange, as well as Sheriff Carona, acted *with malice* in their firing of defendant from his position as assistant sheriff. The award the Superior court reached was increased based on this finding. The United States Attorney now urges this Court to order that those same monies, if ever received by defendant, be *returned to the very governmental entity that acted with malice in firing defendant!*

Accordingly, defendant respectfully requests the Court deny the government's request that defendant pay almost $200,000 in restitution.

### III.D.
**Discussion Involving Defendant Himself versus the Horrific Aspirsions Cast Upon Him by Others at a Time When He Was Not Afforded an Opportunity to Defend Himself and Set the Record Straight.**

Throughout the length and breadth of the state prosecutions of defendant, and throughout the long federal investigation and the ultimate prosecution of then Sheriff Carona, defendant has stood mute. He has not responded publicly to the scurrilous allegations that have been heaped upon him by public prosecutors in the Orange County District Attorney's Office. He has remained quiet as various individuals in the Carona trial, pointing to the empty chair with defendant's name thereon, leveled practically all blame upon him, knowing at the time that he would not respond and defend himself. These individuals, seeking to point the finger of blame at another as they maneuvered in an attempt to avoid their own criminal liability, did so willingly because he was the "easy target."

Defendant is the very first to admit he made mistakes while serving as an Assistant Sheriff in Orange County. From the beginning, he has been willing to shoulder responsibility for his

conduct, unlike so many others.  It is important at this time for George Jaramillo to speak out.  It is incumbent on him to now set the record straight.  However, because he has been so vilified publicly, his comments may carry little weight at this time.

Defendant and his family have been disgraced publicly not once, but over and over again during the past 5½ years.  His once impeccable reputation has been tarnished beyond repair.  Defendant has been disbarred and he cannot practice law.  He has experienced the great indignity of incarceration.  He has already endured significant suffering; he has already paid a great price, both financially and emotionally, during these turbulent years.

However, many good citizens of this County, State and Nation continue to stand by George Jaramillo.  They know him well, they know of his goodness, they are aware of so many wonderful, yet unpublicized ways in which he has blessed the lives of so many.   They seek the opportunity to set the record straight, and to share with this Court their thoughts and insights regarding defendant.  Just a few of the many, many letters written on his behalf are attached to this Sentencing Memorandum, and defendant respectfully requests the Court read and consider the comments of these individuals.  Each has taken the time to consider what to write and then placed their considered thoughts on paper for the Court's benefit.  Each in his or her own right is a respected, successful, contributing member of this community, each wants to be heard, and each deserves to be heard on defendant's behalf.

## IV.
## Defendant's Request for Sentencing.

As stated earlier in this Sentencing Memorandum, defendant believes his Total Offense Level is less than **5**.  His Criminal History Category is II.  He therefore falls within Zone A of the USSG.  That being the case, probation is appropriate and incarceration is not required.

Defendant requests that the Court suspend imposition of sentence and place him on probation for three (3) years.  He requests no additional period of incarceration be imposed; but, if the Court deems it appropriate that a period of incarceration is warranted, that he be given credit for the time he has already served in the Montebello City Jail on the related state case.  In the alternative, he requests any incarceration be ordered "home confinement."  In this way, he can continue to put his life back together and continue to support his loving family.  If the Court believes a fine in warranted, defendant requests the Court consider his need to pursue a new career and at the same time provide for his large family.  Whatever fine he is ordered to pay will

BLUMENTHAL
LAW OFFICES
3993 Market Street
Riverside, California

1    necessarily have a direct impact on his wife, children, mother and elderly aunts.  If financial

2    sacrifice is a form of punishment which the Court deems to be necessary, defendant respectfully

3    asks the Court to consider the costs of bail he has had to pay, as well as the substantial legal fees he

4    has had to pay to defend himself in the federal investigation and prosecution, as well as the state

5    prosecutions which for the most part were unsuccessful and resulted in dismissals.

6

7    //

8

9    DATED:  September 10, 2009

10

11                                                          Respectfully submitted,

12                                                          BLUMENTHAL LAW OFFICES

13

14

15

16                                                          BRENT F. ROMNEY

17                                                          Attorney for Defendant

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

34

35

36

# DEBORAH ANN SPAGNOLI

July 16, 2009

The Honorable Andrew J. Guilford
Judge, United States District Court,
Central District of California
411 West 4th Street
Santa Ana, CA  92701

Dear Judge Guilford:

I write to you on behalf of George Jaramillo. I have known George for seven years. We first met in a professional capacity in 2002 while I was working at the White House as Special Assistant to the President and Deputy Director of Intergovernmental Affairs and George was the Assistant Sheriff of Orange County.  As the President's liaison to state and local elected officials, one of my responsibilities was to travel the country meeting with local elected officials and law enforcement to coordinate homeland security-related issues during the aftermath of September 11, 2001.

It was after one such meeting in Santa Ana, where I was meeting with Orange County officials that George pulled me aside to tell me about how innovative and ahead-of-the-game Orange County and the Sheriff's Department were in emergency preparedness and terrorist-related readiness issues. It seemed that he and the Sheriff were already implementing many of the strategies that were of interest to the White House.  He suggested I tour their emergency operations facility and meet their leadership.   I did so, and as George anticipated, I was impressed by what I saw.  As a direct result of George's initiative, I was able to take what I had learned about the Orange County Sheriff's Department back to Washington to present as a "best practices" for other jurisdictions around the country to model.

Thus began a series of professional meetings, discussions and information sharing initiatives with George, Sheriff Carona and other professionals within the Orange County Sheriff's department. At every step, George was personally involved and clearly committed to ensuring that, in partnership with the White House, Orange County's innovations were made available to assist other agencies nationwide, and that Orange County similarly benefit from the creativity of other agencies.

Shortly thereafter, Orange County faced its own crisis with the kidnapping and subsequent murder of Samantha Runion.   The issue of missing and exploited children also happened to be a priority for the White House, thus, born out of another tragic incident, the

3700 TEMPLETON PLACE, ALEXANDRIA, VA  22304
TELEPHONE: (H)(703) 823.4535; (C)(202) 494-2696; EMAIL: DASPAGNOLI@COMCAST.NET

Administration and the Orange County Sheriff's Department collaborated on yet another important initiative.

I had numerous meetings and phone conversations directly with George and facilitated many others. He, Sheriff Carona and the Sheriff's Department were invited to participate in roundtable discussions with President Bush and other law enforcement professionals on both emergency preparedness and missing and exploited children's issues. As a result of George's initiative and tireless advocacy on behalf of the Sheriff and the Department, Orange County was recognized with a seat at the table on the President's Homeland Security Advisory Council and the Department of Justice's Amber Alert Advisory Committee.

In my professional capacity at the White House, I met and interacted with hundreds of state and local elected officials, law enforcement personnel and their staffs. I continued to advise the White House, the United States Attorney General, Deputy Attorney General and Director of the COPS office at the Department of Justice on a variety of law enforcement issues after leaving the White House and while serving as a Commissioner on the United States Parole Commission. Throughout all of this period, George stood out personally and professionally, among the broad array of professionals that I dealt with.

On the one hand, George was always a pleasure to work with. His work ethic was apparent – he was a doer (as well as a good talker) -- an action guy who doesn't just have meetings for the sake of meetings. At the same time though, he has a sense of diplomacy that allows him to get things done without complaint and with a congeniality that invites cooperation where others might generate antagonism. He is intelligent, articulate, responsible, and in my experience, committed to doing things that are worthwhile, even where they do not benefit him personally.

Because we worked together on a variety of issues, I got to know George on a more personal level. I have always found him to be warm, honest and forthright. I am a fighter myself (for that which I believe) and I admired that same fighting spirit in George. It was apparent to me how close he was to his family – not only to his wife and children, but to his mother and his brother as well.

As I got to know and respect George professionally, it was that love and devotion to his family that I found most admirable about him. He has always spoken highly of his wife and children and his devotion to them was underscored when I saw them together on a family trip to Washington, D.C.

But what moved me even more than his obvious love for his wife and children was his devotion to his mother. I had the privilege of meeting his mother when he brought her with him on one of his trips to Washington, D.C. We had lunch together at the White House Mess and I was able to watch them interact – I don't know which one was more proud of the other. Having seen them together and having seen their interaction as mother and son, it was no surprise to me when I saw how devastated George was when his mother had a stroke. Nor was it a surprise to see his commitment to ensuring her proper care at the hospital and at her subsequent stays at rehabilitation facilities. George was proactively involved in his mother's care every step of the way and I am convinced that she is alive today because of that love, devotion, advocacy and tenacity.

George has been under the scrutiny of the criminal justice spotlight for several years now. It is a testament to his and his family's faith and love and commitment to each other that they have endured this as well as they have. George has risen to the occasion. He has not only handled the situation with dignity, humility and respect, he has done so while remaining positive and upbeat. George and Lisa have tried to continue to provide a normal life for their children and he and Lisa have remained responsible for the daily in home care of George's mother and that of his two aunts (who live with them.)

I am a former prosecutor having spent four years as a Deputy District Attorney prosecuting career criminals in Kern County, CA. As a litigator, criminal justice professional and government relations executive, I understand the law, politics and public relations. I also know how difficult it is to ascertain the truth as a writer or commentator or witness can only discount their own bias and motives so much. I also know how difficult it is to unearth the true essence of any one individual. I try and look at the totality of a situation, assess the credibility of the speaker or writer and use common sense to reach my own conclusions.

I ask that you consider George's positive traits and totality of his life as you make your sentencing decision. First and foremost, George has taken full responsibility for his actions and he has done everything that the government has asked of him. He has done so without public complaint or a private "woe-is-me attitude." He has done so while doing his best to provide for his wife, children, mother and aunts. He has been a dedicated public servant. He is a warm and caring husband and father. And he is a good friend – I have never had cause to doubt his loyalty, his sincerity or his caring for his friends and family. Nor is he a "fair-weathered" friend. I have seen George stand by his friends when it would have clearly been to his advantage to step out of harm's way. Significantly, in the present matter, he has not attempted to point the finger of blame at others so as to benefit himself.

I sincerely believe that this difficult situation has humbled George. I have seen him grow personally and spiritually and believe he is a better person today as a result. They say it is in adversity and suffering that the true character of a man is revealed. It seems to me that the dignity and respect and responsibility with which George has handled these past few years are a testament to his true character.

Sincerely,

Deborah A. Spagnoli

July 15, 2009


The Honorable Andrew J. Guilford
Judge of the District Court
Central District of California
411 West 4th Street
Santa Ana, CA 92701

Dear Judge Guilford,

I am writing this letter on behalf of George Jaramillo.  Please allow me to introduce myself to you.  Formerly, I was a peace officer in California for 25 years, beginning as a patrol officer and working my way up to captain before I left the service.  Since leaving policing, I have for almost the last 5 years worked as a deputy district attorney in Riverside and San Bernardino counties.  I am the father of four children, 11-17, and have spent the last 5 years fully engaged in my children's youth sports as a coach, assistant coach, and child supporter.  I am currently an elder within my church and I make no bones about the fact my faith has sustained me throughout the last 20 years of my life.

I met George when he was a peace officer for the Garden Grove Police Department and I was a peace officer for the Fullerton Police Department.  We became friends and colleagues when we both attended law school, beginning in January 1989.  We studied together, supported each other, and forged a friendship through the rigors of law school while continuing to work fulltime as peace officers in our respective communities.  It was readily apparent early in law school that George was blessed with an extraordinary capacity to learn quickly and apply that new found knowledge to his life's endeavors.  I consider George to be instrumental in my personal success in law school, prevailing in the difficult circumstances of balancing school, work, and family.

George has proven to be a supportive friend and I can only hope that he feels that same way about me.  I believe we do God's work when we are of service to our communities, families, friends, and those in need of assistance.  I believe George holds those same values and I have had the opportunity to see those values demonstrated in his personal life.  Lastly, George's dedication to his family is something I aspire to emulate.  I have spent time with his wife, Lisa, and their two children, George and Amanda.  It is a family that has been strengthened through the challenges faced and the obstacles overcome.

Very truly yours,

Michael Stedman

*Law Offices*
*of*
*Julio A. Jaramillo*

July 14, 2009

The Honorable Andrew J. Guilford
Judge, United States District Court
Central District of California
411 West 4ᵗʰ Street
Santa Ana, CA 92701

**Re:  George Jaramillo**

Dear Judge Guilford:

My name is Julio Jaramillo, I am George Jaramillo's twin brother and only sibling.
Rather than present you with dozens of letters of recommendation for my brother from
our relatives I have gladly accepted the task of communicating with you on behalf of our
entire family.  I represent the sentiments and association of a united, loving and fiercely
law abiding family that spans the continents of North and South America, comprised of
George's Wife and Children, our Mother, Aunts, Uncles, Nephews and Cousins.  I write
for many and so I ask your indulgence and apologize in advance for the length of my
letter.

George and I were born in Ecuador and became first generation immigrants to the United
States when we were approximately 5 years old after the untimely and tragic death of our
Father.  Our Mother, alone with her twins, and unable to speak English was forced to
forge forward and provide a life for her children.  In New York Mother was joined by her
two older sisters who would, from that day forward, never leave her side.  Our Mother
and Aunts provided a loving though strict home environment where expectations and
standards for George and I were high and love and support were abundant though
material means were not.

When George and I were about 10 years old our family moved to California.  From my
earliest recollection, corroborated by discussion with family members, George was the
perfect child.  His third grade teacher dubbed him "boy wonder" and he spent his entire
childhood living up to that moniker.   George overcame early challenges with the
language and strived for and achieved academic excellence.  In elementary school
George was selected as a school "Service Club Member", a position allowing selected
children to assist teachers and office staff with their tasks.  I recall watching my brother
take great pride in erasing blackboards and helping to count lunch money after school.

During our Junior High School years, when so many of our friends experimented with harmful practices George and I simply did not. I am proud to report of my brother that to this day he has never had a drink, smoked a cigarette, or used any drugs, unless prescribed to him. At our Junior High graduation George received the Principal's Honor Award. The tears of joy and pride which streamed down the faces of our Mother and Aunts was more reward for George and I than all the accolades and trophies in the world.

In our family we were taught and learned from a very young age to have respect for and obey the laws and the leaders of this great country that provided us so much opportunity. We learned to be honest in all our dealings and were repeatedly reminded that any action of a family member impacted the entire family. Through daily example we learned the importance of service to others and respect for self. Religion became a centerpiece of our lives from the time we were 8 years old until today and the lessons learned at home were reinforced by the activities and teachings of our church.

We did very well through High School with George continuing on his incredible trajectory of accomplishment. By the time we graduated he was named one of the top 79 students in Orange County, was a lifetime California Scholarship Federation Member, was selected as one of our High School's Student of the year, graduated with honors and was one of a very few recipients of our school's Medallion of Excellence. And, more than all this, George and I had made it through, what are often tumultuous years, with no disciplinary problems at all. In fact, through our entire youth neither he nor I received so much as a detention. Again, at graduation, I had the privilege of standing with my brother, and family, and of relishing in a moment that comes from making those you love proud and knowing you have done right by them. A feeling our family would be able to share many, many times because of George's contributions.

When we turned 16 and were allowed to begin dating George almost immediately met Lisa at Church. They would navigate from High School Sweethearts thru the twists and turns of a 31-year relationship culminating in the celebration of their 26th Wedding Anniversary this past month. Along the way they have been blessed to parent two incredible children, Amanda, 13 and George II, who is 22 years old, and recently completed his first year at BYU after himself returning from a two-year mission. George and Lisa are now teaching their children well the lessons of a strong sense of duty to family, respect for the law and service to others. Of the countless accomplishments achieved by my brother none has brought more joy to our family than the success Lisa and he have enjoyed in their marriage and with their children.

Thru our late teen years we busied ourselves with scouting, church and sports. We both obtained our Eagle Scout rank, finished a four year early morning study seminary program at church, where my brother was selected as President of our graduating class, and played basketball at every opportunity. To this day we disagree about which one of us was a better point guard.

At age 19 George turned down many scholarship offers and we both served a two-year mission for our Church. This call to serve would prove to be a life shaping experience that allowed us to practice many of the concepts instilled within our home, and to solidify the manner with which we would conduct our lives.

Upon returning home we pursued our education, started our own families and began our respective careers. It was always George's ambition to become an attorney. Mine was to become a police officer. I served as a police officer for nearly 25 years before becoming a lawyer myself several years ago. George became a police officer prior to going to law school, and worked graveyards as a patrol officer and sergeant to attend law school during the day and evenings ultimately becoming an attorney in 1994.

Like in our childhood and young adult years, as we aged I saw George do what was right, always. He grew into a well educated, exceptionally talented and highly principled man. His commitment to his family was reiterated when our Mother and Aunts retired with limited means and George and Lisa volunteered to take them into their home some 15 or 16 years ago, where they have remained since.

Progressing quickly thru law enforcement ranks and increasing his community involvement George began to be widely recognized as a leader to watch. He was articulate and not afraid to take up causes he believed in regardless of their popularity. He paid particular attention to the needs of the Hispanic Community in Orange County as we had witnessed first hand that equality still needed some developing in our county and in particular within our chosen professions. George's efforts and struggles had direct and significant impact on the lives of many who followed trails he blazed. He wasn't afraid to take hits and fight for what he believed to be right. This served him well but cast him into a new light, sometimes unpopular, often controversial. I would frequently speak with him and question why he spent so much time, exerted so much effort, and withstood so much opposition for causes, organizations and personal plights of others that seemed to bring him little if anything at all. He would dismiss my queries with a resolute, "Someone has to do it, and I'm the man to get it done".

George decided early in his thirties that he wanted to make a difference, that he wanted to use his many talents and gifts to make an impact, not just a living. He began to work tirelessly to position himself to have a voice for furthering causes he believed in and for fighting for the rights and wellbeing of those without similar opportunities.

My brother felt that the political arena offered the most opportunity to provide meaningful service. He developed a 30 year plan that included becoming Orange County Sheriff, there after Orange County District Attorney and then looking to run for Congress and returning to California to pursue state wide office by making a run at Governor or State Attorney General. Those close to him, including me, thought his plans would be derailed by lucrative private sector opportunity that would replace his lofty altruistic ambition with wealth and gracious living. Detractors bristled and labeled George as arrogant, blinded by ambition and unrealistic.

But, my brother had a dream and a clear vision of how to go about accomplishing that dream and he set out to do just that. He dove into county politics and ran the successful campaign of the underdog for Sheriff. Almost over night, it seems, my brother, was met with previously unseen levels of opposition and criticism at every juncture. Undaunted he did what he believed to be right and garnered support and respect even from some of his most ardent detractors. As assistant sheriff he was a capable and effective chief of operations and chief of staff who worked long hours to better the conditions of those under his charge, and to protect and provide for the needs of his department's constituents. All the while functioning as a loyal shield and a backstop to his boss.

Despite a constant dose of conflict and controversy George's commitment to duty, tenacity and focus on his vision were prevailing and he was generally recognized as the probable successor to the position of sheriff. He was becoming known in political circles outside of California and within the Beltway in Washington. My Brother, now 44 years old, had thus far enjoyed a unblemished and highly lauded work history and a life completely free from even rumored violations of law, he was well on his way to living his dream, to making a significant impact and positive difference.

Then in 2004 George's world turned upside down, with no inkling or understanding as to why, he was summarily dismissed by the sheriff and subjected to a barrage of rumors and innuendo of wrongdoing, "corruption", and criminal investigations. The nightmare that followed defies adequate description as an unscrupulous district attorney in collusion with the sheriff and other political operatives maliciously PERSECUTED George and our family. In 2007 after nearly three years of arrests, indictments, search warrants, intervening indictments, more search warrant,s the filing and dismissal of some 30 felony charges and the attempted prosecution and threat of prosecution of innocent members of our family, my brother plead nolo contendre, in an act of bravery, to stop, not only his beating, but to prevent the threatened, eminent, unwarranted arrest of his wife Lisa. He plead no contest to perjury (a charge stemming from his truthful 2004 testimony to a State Grand Jury, about a well documented and reported legal act that occurred in 2000 that was re-read into the record of a 2006 Grand Jury to form the basis for a perjury charge,) and to misuse of county resources (this charge arising from a 2002 helicopter ride from the hospital bedside of our then dying mother, to catch a flight to attend a White House Function. This act was also well publicized and the $241 cost paid for in 2002). After three years of fighting and prevailing my brother would have died before pleading guilty for something he did not do, but he was at peace pleading no contest and swallowing that very bitter pill to protect his family from further unwarranted, and unrelenting intrusion and persecution.

Despite his complete and utter innocence my brother, sentenced to one year in jail, quietly withstood the humiliation and grotesque unfairness of that incarceration. He was a model inmate and was released with glowing reviews from the jail where he served his time, described as one who helped others while incarcerated. No one has heard my bother utter a word of hate, bitterness or malice for this situation or for anyone involved with it. Rather he has put it behind him and served as an example of how to deal with adversity.

Now, branded a felon, his license to practice law is gone, his dreams are shattered, and his determined manner, once confused by some as arrogance, has given way to the worried but optimistic look of one hoping to survive.

Within days of his termination as Assistant Sheriff the FBI knocked on the door at my Brother's house, I know because I was visiting that day and answered the door, my brother was not in. They asked that he contact them and the rest, as is said, is history. Unlike the travesty that was the district attorney's persecution of George, his federal prosecution was at least, as a matter of fact, rooted in a violation of law on the part of my Brother. He was the first to tell me this and would be the last to deny it.

As things developed several attorney friends of ours and I met with George and vehemently counseled him to fight the charges. It was our position that the charges he was facing stemming from his under reporting of income and failure to report gifts on state disclosure forms, once aired in totality, and within correct context including the circumstances and amounts involved, the actual applicability of underlying statutes, and statute of limitations considerations, could be successfully defended. George's opposition to this notion was sharp and immediate. He explained that once he fully understood what he was being charged with and realized that, he had in fact underreported his income, and had in fact failed to disclose gifts on his state disclosure forms and had in fact mailed those forms using the US Postal Service, he concluded that he must do the right and honorable thing and accept full and unconditional responsibility and strive earnestly to correct and make amends for his wrong doing.

Since that time I have interacted with George on nearly a daily basis and have watched his efforts to make amends for his wrongs and fulfill his commitments to the government. Not one time has he minimized his wrongdoing, looked for excuses or joined others in trivializing conversation. To the contrary he has accepted responsibility fully and has taken every opportunity to set the record straight as to the seriousness of this matter and as to his remorse for his actions.

As mentioned before, George provides a home for his wife and children as well as our Mother and two Aunts (ranging in age from mid 70's to 80's). As my Mom and Aunts age their health has deteriorated. Mom has been bed-ridden since suffering a massive and totally debilitating stroke in 2002. One Aunt has been stricken with Lymphoma and the other struggles with the onset of dementia. I share these family challenges only to illustrate the goodness of George, and underscore that he is the sole provider who has stepped up to ensure that these wonderful aging women are cared and provided for. His lofty dreams of changing the world for the better may have been destroyed but his goodness, commitment to family, and sense of duty and service remain unchanged.

Many times I've read media accounts of an individual bearing my brother's name, but not of my brother. The truth and the facts regarding George have been distorted and sensationalized beyond recognition. While I know nothing of the strategy involved in the recent trial before Your Honor, I can't help but wish that my brother would have been

allowed to testify before You. I am certain you would have discerned him to be an honest, credible and forthright individual of significant capacity for good and of great remorse for his wrongdoing. I only hope that my clumsy and lengthy attempt to illustrate the good and worthwhile individual I KNOW my brother to be is considered by the court in reaching a sentencing decision that recognizes George and our family as one worthy of leniency and every consideration. I thank you.

Respectfully,

Julio A. Jaramillo



**Lakewood**
Regional Medical Center

3700 E. South Street
Lakewood, CA 90712
Tel 562-602-6751
Fax 562-602-0083
http://www.lakewoodregional.com
July 13, 2009

The Honorable Andrew J. Guilford
Judge of the District Court,
Central District of California
411 West 4th Street
Santa Ana, CA 92701

Dear Judge Guilford:

I am pleased to write this letter on behalf of George Jaramillo. I am Director of
Organizational Development and Hospital Services for Lakewood Regional Medical
Center and part of the administrative leadership at our facility. As such, I have been
associated with our parent company, Tenet Healthcare, for nearly 28 years. I have been
associated with George since 1991, and can provide first-hand information on his
character, dedication to his family and community, and personal integrity.

George and I have served over the past years on a variety of community and civic boards,
including the United Way and Chamber of Commerce. I have always been very
impressed with George's dedication to community and to the ideal of volunteerism. He
has always demonstrated the highest degree of honesty and integrity, and has always been
one among few who will step up and make a commitment when others are unwilling to
lead and to ensure that goals of the organization are reached. I have seen him step up
when no one else would - many times doing so without any fanfare or recognition. His
commitment to the Hispanic community has always impressed me, as has his willingness
to take a strong leadership role in an area, even when his position might render him
unpopular.

I strongly believe in community and civic service myself. As a past president of several
organizations in the Los Alamitos, Seal Beach, Lakewood and Paramount areas -
including the Chamber of Commerce, American Cancer Society, Hotline of Southern
California, as well as a board member of Casa Youth Shelter, Cypress College
Foundation, Rotary and Citizen of the Year from Los Alamitos/Rossmoor/Seal Beach, I
know first-hand the time and personal sacrifice that is required of someone who is
sincerely dedicated to the common good. I have found George Jaramillo to be such an

individual, and have seen him make personal sacrifices for a myriad of causes in which he believes.

My husband and I have also gotten to know George's family well over the years. And it is in this arena, too, that George's personal sense of commitment has been evidenced to those who know him. Within the walls of his own home I have seen George display a great level of unselfish service and dedication. As a husband and father, George has always taken great pride in his family, and has shown extraordinary compassion, love and caring as he has provided a home, love and service to his mother and two aunts. It was after his mother's stoke that we saw George display a level of service that many only pay lip service to.

The time, personal resources and extra mile efforts he has shown throughout the many years I have known him are, in my opinion, truly acts of selfless service and unconditional love.

I consider George to be a kind, compassionate and caring individual and I continue to be proud to know him.

Sincerely,

Kay Kofford
Director,
Organizational Development and Hospital Services



July 14, 2009

The Honorable Andrew J. Guilford
Judge of the District Court,
Central District of California
411 West 4th Street
Santa Ana, CA 92701

Dear Judge Guilford:

It is my sincere pleasure to provide a letter of recommendation for George Jaramillo.

Over the past seventeen years I have enjoyed a close personal relationship with George
Jaramillo and his family. Throughout this period of time my dealings with George have
interwoven personal, professional, and community based relationships, each serving to
reinforce my belief in him as a person of character and integrity.

Presently I am a principle as well as President and CEO of West Coast Grass
Distributors, a company dedicated to education and the preservation of our natural
resources through alternative measures. Previously I served as President and CEO of
Strategic Asset Services, as well as President of SAS of California Inc. I am a scout
leader within the Orange County Council of the Boy Scouts of America, and in this
capacity worked with George Jaramillo Jr. as he achieved the rank of Eagle Scout – an
honor also achieved by his father.

Through professional and family associations, I have worked with and socialized with
numerous elected officials, appointed officials, and luminaries. George Jaramillo stands
out among these distinguished men and women as a generous person who has continually
demonstrated a level of love and compassion I have rarely seen in others. Even as the
Jaramillo family has been overwhelmed by well publicized, *and* some very private
adversity, George has stood first in line to assist my family through a frightening health
crisis.

I have always known George to be a man of deep compassion. I have personally
witnessed covert acts of benevolence and generosity toward men of means, as well as
those who labor to make ends meet. I am further convinced that George would be
embarrassed at my discovery.

We are all aware of remarkable individuals whose lives intersect our own. My
association with George has been of great benefit to me personally as I have observed
and have tried to emulate many of the virtues he has demonstrated in almost two decades



of friendship. Consequently I am a better husband, father, and friend. His example has
shown me how to find good in others, even as they attempt to tear you down. He has a
quick wit and is among the most talented and charismatic personalities I have seen.

Judge Guilford, I appreciate your indulgence of this letter on behalf of George. Please
feel free to contact me at 949-677-9012 anytime for further praise or with any questions.

Respectfully,

Patrick G. Brokaw
President/CEO
West Coast Grass Distributors
949-677-9012



Kushner ▪ Smith ▪ Joanou ▪ Gregson

CERTIFIED PUBLIC ACCOUNTANTS

July 14, 2009

The Honorable Andrew J. Guilford
Judge of the District Court,
Central District of California
411 West 4th Street
Santa Ana, CA 92701

Dear Judge Guilford:

I am writing this letter on behalf of George Jaramillo. My name is Larry Gregson; I am an Owner of a Certified Public Accounting firm, Kushner, Smith, Joanou & Gregson, LLP, located in Irvine, California and has been in business since 1979 and employed 55 employees. I have been involved in community organizations such as President of a large Home Owners Association. I have been involved with California State Fullerton on their Business advisory Board and I currently serve as a Bishop in my church.

I have known George Jaramillo for the last 15 years by being his neighbor and also by serving as his bishop in our church. In our relationship as a neighbor, friend and Church leader, George has always been a very likeable and personable person, who loves people and cares about those that he come into contact with. George has an incredible work ethic and sometimes we joke that he works so much that we never see him in the neighborhood. George cares for his family and loves them very much. He also sets a great example of caring for his mother and two Aunts by having them live in his home. This is a very rare thing to do in our nation to care for loved ones when much of the world is not as responsible and lets the state or federal government take on that care. George and his wife Lisa have also raised very respectable children who are responsible and law abiding children. Their family has always been great neighbors and good people to have in a community.

George has been through some very difficult issues over the last five years but I have been impressed how he has faced those trials. He has dealt with them honestly; he has taken every step to cooperate with law enforcement and the legal system. He has taken full responsibility for all of his actions. As his Bishop I have been most impressed how he has helped his family get through these trials and has shown great patience and love in caring for their needs, both physically and mentally. George is a loyal friend and loves his fellow man and his country. He is a strong contributor to society and makes a positive impact with whoever or anything he gets involved with.

I would be happy to meet with you or testify as to George's character and positive attributes he posses, if you so choose. Please don't hesitate to contact me if further questions or clarifications of this letter are need.

Sincerely,

Larry W. Gregson

Kushner, Smith, Joanou & Gregson, LLP
Licensed by the California Board of Accountancy, Member of AICPA
8105 Irvine Center Drive ▪ Suite 1000 ▪ Irvine California 92618 ▪ 949-261-2808 ▪ Fax 949-261-0188
www.ksjgcpa.com



July 16, 2009

The Honorable Andrew J. Guilford
Judge of the District Court,
Central District of California
411 West 4th Street
Santa Ana, CA  92701

**RE:   GEORGE JARAMILLO**

Dear Judge Guilford:

This letter is being written on behalf of Mr. George Jaramillo, whom I have known for over a decade.  I am the President of TriPacific Capital Advisors, an investment firm headquartered in Orange County which provides advisory services to institutional investors.  I first met George during Mike Carona's initial campaign for Sheriff in 1998, and was impressed from the first moment by George's obvious intelligence, erudition and candor (the latter being a trait one rarely encounters in political campaigns).  I also admired George's enthusiasm and tireless efforts during the campaign, and was very pleased when our acquaintance grew into a friendship with him and his family that endures to this day.

One of the things I immediately liked about George was his openness, and willingness to listen to the ideas of others.  As a member of the Sheriff's Advisory Council since the late-1980's, I had fairly regular contact with both Sheriff Gates as well as members of his command staff.  As the elected Sheriff for 24 years, Sheriff Gates and the rest of Orange County Sheriff's Department had certain well-entrenched ways of doing things, some of which were overdue for change. As Assistant Sheriff, George encouraged new ideas, and did not blindly accept the status quo merely because that was the established wisdom.  Predictably, that approach occasionally ruffled some feathers within the Sheriff's Department, especially given the fact that George, although capable of great tact, is also someone who disdains artifice, and is honest to the point of bluntness.  His frank and direct manner can be disconcerting to some, but I view it as a mark of integrity.

Over the past decade, I witnessed George and his family experience the absolute best and worst of times, culminating in a fall from grace was both precipitous as well as very public. I have always believed that a person's true character emerges in times of great stress, and what I observed throughout these events was that George continued to be a dependable, hard-working, rock of stability for his family, which included not only his wife and two children, but also his aging mother and two aunts, all of whom live with him and depend upon him as their sole source of support. Rather than blame others for his

Hon. Andrew J. Guilford
Re: George Jaramillo
Page -2-

difficulties, George acknowledged his mistakes without an ounce of self-pity or rationalization. Rather than isolate himself and shirk his responsibilities as the media frenzy around him heightened, George redoubled his efforts to sustain his family, encourage his friends and support his church. These efforts included not just honoring his ongoing financial commitments (e.g., helping his current eldest son through college, paying medical bills for his mother and aunts, etc.), but also making certain that he met his intangible obligations to provide solace, guidance and strength to his family. In particular George provided an ongoing example to his son and daughter of how to conduct oneself in difficult times, and accept without complaint the consequences of one's actions.

I believe George Jaramillo has emerged from the experiences of the last several years as a wiser and better man. His life prior to his current difficulties has been exemplary, and one dedicated to public service as a police officer, church elder and court officer. I respectfully ask and encourage the Court to look upon George's case with great favor and well-deserved leniency. Thank you for your consideration.

Respectfully,

Geoffrey S. Fearns

*Barbara Patison*

308 Avenida Santa Margarita

San Clemente, CA 92672


The Honorable Andrew J. Guilford

Judge of the District Court,

Central District of California

411 West 4th Street

Santa Ana, CA 92701


Dear Judge Guilford:

I am writing to you on behalf of George Jaramillo. I own and operate a Preschool and am on the Board of Directors for the Raise Foundation, an organization for the Prevention of Child Abuse. I am also an attorney, but do not currently practice.

I have known George Jaramillo for about twenty years. We met in Law School and developed a friendship through studying together as well as carpooling to and from school. Over the years our friendship has grown through good times and bad, from the birth of children to the aging and caring for our parents.

One of George's most amazing character traits it his dedication to family. Several years ago his Mother and two aunts moved in with George and Lisa. I recall one conversation when I asked him if it was difficult, and he responded how difficult it is to watch as they age and not be able to "fix" their health problems. His Mother and Aunts are truly the kindest and most gentle women you could ever hope to meet. His family is comprised of his Mother, two Aunts, Wife and two children. His children are responsible and respectful. For example, while his son was on his mission he would take time to drop me a card or letter to let me know how he was doing. I find it extremely rare that a young boy of 19 or 20, away from home, would take the time to write to an old friend of his parents. I think his parents have taught him to value and nurture family and friends.

George has been the friend who, for better or worse, is honest with me. He is the guy who tells it like it is. The older I get, the more I appreciate that trait.

Thank you for your time.

Sincerely,

*Barbara Patison*

Barbara Patison



**KRYSTAL ENTERPRISES ®**

July 20, 2009

Judge Andrew Guiford
U.S. District Judge
Court # 10D
411 West Fourth Street
Santa Ana, CA 92701

**RE: George Jaramillo**

Dear Judge Guilford:

My name is Mike Hill and I am writing on behalf of George Jaramillo. I am Vice President and CFO of Krystal Enterprises, a 26-year old company headquartered in Orange County. We are the largest manufacturing company within our industry in the world. I assumed this position nearly 16 years ago. Prior to this I was president of three public corporations.

I first met George Jaramillo in 2004 when we at Krystal were making a change in our corporate in-house counsel. As the Office of General Counsel reported directly to me, I shouldered the responsibility to review the candidates' qualities. Our company's president asked me to consider George's qualifications along with those of the other candidates.

I found his bearing and qualifications impressive, but I soon learned of his legal problems. I was forthright with my concern, and I immediately declined to pursue his application further. George persevered despite my initial resistance. He faced my comments directly and responded with candid answers. Not once did he minimize my concerns: on the contrary, he agreed they were appropriate. He answered every question in an open and forthright manner. I found that he engaged me, and the subject, with uncommon sincerity.

George said he wanted an opportunity to earn our trust and to impress us with his work-product, with no strings attached and with no long-term commitments from Krystal. That conversation happened more than five years ago. Since then, I have seen, first hand, and contrary to my personal prejudgment, a fine man and exemplary employee.

George was a fantastic attorney for our company. He is very intelligent, tenacious and takes pride in earning every penny he makes. When he told us that he was likely to be disbarred and so would not be able to serve as our attorney, we presented him an opportunity to fill an existing void in our management team. As he did when we first met, he removed any skepticism with an honest, transparent manner and solid results.

In a relatively short period of time George has become a leading member of our executive management team, helping guide the company thru historically difficult times and being a critical component in providing our employees realistic hope for the future. In addition to his public and business contributions he has become a loyal and trusted friend to many of us. My wife and I have developed a strong personal friendship with George and Lisa and feel our lives have been enhanced by our interaction with them. This, sentiment is shared by many within our company.

Without excuse or minimization George has told me he made mistakes, and is doing all he can to make them right and move forward with his life. Now, as I did more than five years ago, I believe him to be sincere. I have personally witnessed his efforts, from minor to magnanimous in public and private ways.

You may have some understanding of the devastation the economy has brought to the auto industry. We have not been spared, and I cannot envision our company's survival without George Jaramillo's continued vision, dedication and leadership. I therefore, request, not only for George, but for the many hundreds of Krystal employees who depend on us for their survival that you consider the many contributions George has and continues to make as you impose his sentence. I appreciate your consideration as you carry out the weighty responsibilities of your important office.

Sincerely,

*Mike Hill*

Mike Hill
Vice President/CFO
Krystal Enterprises

THE LAW OFFICES OF

# MICHEL F. MILLS

A PROFESSIONAL CORPORATION
14121 BEACH BOULEVARD
WESTMINSTER, CALIFORNIA
92683

TELEPHONE
714.892.2936

FAX
714.892.5806

July 20, 2009

The Honorable Andrew J. Gilford
United States District Judge
Courtroom 10D
411 West Fourth Street
Santa Ana, California 92701

RE: People v. George Jaramillo, Case No. SA CR 07-36-AG

Dear Judge Gilford,

It is my pleasure to discuss my experiences with George Jaramillo. I hope these observations will provide a more complete picture of him and will assist you, in some small way, as he now stands before you. I have known George now for approximately six years. This experience taught me a great deal about George, his character, and his commitment to his family and his many contributions to our community.

Over this period I have had the honor of representing George in two legal actions. In the first, I represented George against the prosecution Sheriff Carona spearheaded with the district attorney in the Superior Court; I was the third member of George's criminal defense team. I will tell you that George was unequivocally maliciously prosecuted, and the injustices perpetrated against him were nothing less than shocking! Through this experience, however, I came to see George as the dedicated husband and doting father he is who, time and again, put his love of family and his concern for their wellbeing far above any self-interest.

Most recently, I was the lead trial lawyer representing George in his successful wrongful termination action against the County of Orange. This work gave me the responsibility of attending and observing the vast majority of the Carona trial. I noted that both the prosecution and defense in the Carona trial utilized the "empty seat" to cast aspersions maligning George, in a trial where he was never called to testify and never received any chance to respond to their allegations. However, that trial made no mention of the George that I know and that my teenage son and so many others respect.

Through George's wrongful termination trial, we proved that George was the conscientious, fair-minded person I know. Superior Court Judge Andrew Banks found Sheriff Carona fired George in retaliation for his efforts in trying to stop Carona's illegal activities. Judge Banks found George was a whistle-blower. Judge Banks also found Mr. Carona retaliated against George's whistle blowing with malice when he embarked on a course of conduct intended to discredit George as a witness. In short, Judge Banks found that not only did George strive

to tow the line, he suffered slings and arrows from others when he attempted to ensure they also towed the line. Across these issues, and many more, Judge Banks found George to be a very credible witness. That's the George I know.

Perhaps it is here that my experience with George can provide the most insight into this man as he now stands before you. Teaching our children right from wrong is very easy to do in the abstract, but the court system is a testament to the complexity of divining right from wrong in the real world. When we discuss our faults and foibles, we invariably justify, explain and excuse - even when we pretend to accept responsibility.

Yet, I have watched George field the toughest questions a man can answer, from the public, in depositions and at trial, with complete honesty and openly accepting responsibility for what he has done wrong. I've seen him answer even more pointed questions- those from a teenager suspicious of hypocrisy asking about such public faults and foible, again with absolute candor. My son C.J., now 15 years-old, has been greatly impressed by George from their first meeting several years ago while he was still Assistant Sheriff. Since then my son would ask George about the various charges he faced and would ask what happened. When CJ asked George about the matters now before this Court, and when those matters were raised as issues in the wrongful termination trial, George's response was always the same.

In my experience with him, George has never explained, excused or attempted to justify the conduct at issue in the matters before this Court. On the contrary, he has always taken full responsibility for these actions without exception or qualification. What more can be asked of a man than that he recognize his mistakes, accept responsibility, make amends to the extent at all possible, and ensure that the acts not be repeated? George has done this completely. And the brutal punishment and harm he and his family have suffered (some legitimate, most not) have not caused George to shirk responsibility. Rather, at every ugly and painful turn he has humbly and quietly accepted all difficulties, recognizing them to be matters he must overcome in order to move forward.

I sincerely hope these thoughts may help persuade this honorable district court that George Jaramillo is a man whose behavior shows complete acceptance of responsibility for his conduct and an unwavering commitment to make amends for it, as this court sits in judgment of this good and deserving man.

Respectfully,

MICHEL F. MILLS
LAW OFFICES OF MICHEL F. MILLS P.C.

The Honorable Andrew J. Guilford
Judge of the District Court,
Central District of California
411 West 4th Street
Santa Ana, CA 92701

Dear Judge Guilford:

I am writing to you on behalf of George Jaramillo. My name is Don Duffy. I am a CPA and was a founding partner of Onyx Acceptance Corporation (Onyx), an automobile finance company in Orange County. Onyx employed 1,300 people and operated in most states in the nation. In February 2003, Onyx was sold to Capital One. At the time of the sale I was an Executive Vice President, the Chief Financial Officer, and a Member of the Board of Directors. I have also been involved in Boy Scouts of America (BSA), serving in various positions including scoutmaster. I am also a member of the Church of Jesus Christ of Latter-Day Saints and have served in various leadership and support positions.

My association with George began twenty-eight years ago when George was a teenager in Santa Ana, California. I associated with him in scouting and church activities. At that age, George was an outstanding young man and showed great promise as a leader. He demonstrated this promise in the scout troop. George worked very hard to earn his Eagle Scout award and was instrumental in inspiring others to earn that award, as well.

When George was nineteen years old, he left home to serve a two-year mission for his church in Washington D.C. During those two years, his focus was on serving others. It was there that George learned to work hard and to sacrifice for others. Upon his return, I was impressed by his personal growth and increased maturity. Shortly after serving this mission George married Lisa, whom he had met and dated before his missionary service. When asked about his life's goals, I still remember him telling me that he was going to be a police officer and get his law degree, goals he has since accomplished.

George has been the main source of financial and emotional support for his mother and his two aunts for as long as I have known him; George's father was killed before they immigrated to the United States. I have watched him care in a loving and kind way for these three women as they have aged. He has been very respectful and kind. When his mother suffered a stroke a few years ago, George was constantly at the hospital and continued to care for her at his home when she was released from the hospital.

Soon after his marriage, my family and I moved from Santa Ana and had no personal contact with the Jaramillos. Fifteen years ago, we moved to Dove Canyon and discovered that we were now neighbors with the Jaramillo family. I again became very involved with his family through scouting and church. I was the scoutmaster and an advisor in a religious setting to his son, George Jr., and our teenage daughters are also close friends. These past few years have been very difficult for their family. I am impressed with the way George and Lisa have been able to keep their family active in all areas of their lives rather than withdrawing from society. In my observation, this has been possible only because George and Lisa have remained completely committed to each other and to their family. They faced very difficult issues that would have destroyed most families in an honest and frank manner. George could have become very bitter and angry, but instead made a conscious decision to put those issues behind him and move on with his life.

I will close with a personal example of how George has personally helped my family. I have a son who struggles with a depressive disorder that often makes life very difficult for him and the other members of our family. On his own initiative, George has sought out my son to talk about life, tell him how impressed he was with a talk my son gave in church, or just to tell my son how impressed he was with something he had done. These interactions have given my son renewed hope and strength to fight his illness, overcome adversity, and strive to achieve his life's goals. George Jaramillo has been a good friend for many years.

Thank you for taking the time to consider this letter. I hope it conveys my respect for George and will assist you as you consider what kind of a person he is.

Sincerely,

Don Duffy